IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

JACQUELINE LAFFERTY,            )
                                )
            Plaintiff,           )
                                )
        v.                      )    Case No.
                                )    12-3382-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting        )
Commissioner of Social Security, )
                                )
            Defendant.           )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jacqueline Lafferty seeks review of the final decision of the

Commissioner of Social Security denying plaintiff's application for disability benefits

under Titles II and XVI of the Social Security Act ("the Act").  Plaintiff argues that the

ALJ erred in (1) discounting the opinion of Dr. Schuetz of Forest City Family Practice

that plaintiff could lift no more than five pounds, stand and/or walk for only 15 minutes at

a time and for a total of two hours per day, sit for only 30 minutes at a time and for three

hours total per day, and would need to lie down five times per day to alleviate pain; (2)

assessing an arbitrary residual functional capacity; and (3) discrediting plaintiff's

subjective complaints.  I find that the substantial evidence in the record as a whole

supports the ALJ's finding that plaintiff is not disabled.  Therefore, plaintiff's motion for

summary judgment will be denied and the decision of the Commissioner will be

affirmed.

## I.    BACKGROUND

On December 4, 2009, plaintiff applied for disability benefits alleging that she had

been disabled since December 29, 2003.  Plaintiff's disability stems from leg and back

problems and right shoulder arthritis.  Plaintiff's application was denied on March 10,

2010.  On May 2, 2011, a hearing was held before an Administrative Law Judge.  On

December 6, 2011, the ALJ found that plaintiff was not under a "disability" as defined in

the Act.  On June 13, 2012, the Appeals Council denied plaintiff's request for review.

Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a

"final decision" of the Commissioner.  The standard for judicial review by the federal

district court is whether the decision of the Commissioner was supported by substantial

evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);

Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d

178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The

determination of whether the Commissioner's decision is supported by substantial

evidence requires review of the entire record, considering the evidence in support of

and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB,

340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The

Court must also take into consideration the weight of the evidence in the record and

apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d

1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450

U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Cynthia Younger, interrogatories of vocational expert Michael Wueman, documentary evidence admitted at the hearing, and medical evidence from consultative exams conducted after the hearing.

## A. SUMMARY OF TESTIMONY

During the May 2, 2011, hearing, plaintiff testified; and Cynthia Younger, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

Plaintiff has a high school education (Tr. at 41).  She last worked in 2003 when she and her husband owned a motel in South Dakota (Tr. at 41, 49).  Plaintiff sold the motel in 2006 because she could not keep up with it -- she kept falling and she got too scared at night time working there (Tr. at 41).  Plaintiff was afraid of her husband's side of the family because they assaulted her and tried to break her back (Tr. at 41).  She was held in a "crucifixed hold." (Tr. at 41-423).  This occurred on December 29, 2003 (Tr. at 42).  No criminal charges were filed as a result of this assault, but plaintiff does not know why (Tr. at 52).  She said the prosecutor told her he could prosecute "who he wanted to" (Tr. at 52).

Plaintiff's motel had 12 rooms (Tr. at 50).  Plaintiff was the only person cleaning the rooms and she also worked the front desk (Tr. at 50).

Plaintiff continues to suffer from fear (Tr. at 46).  When a strange car goes by her house, she gets out her gun and lays it on the table (Tr. at 46).  She has not sought any treatment for this, she just stays in her house (Tr. at 47). Plaintiff filed a lawsuit over the assault incident and described that case as follows:

> Well, we finally got out -- we had a lawsuit on -- for they stole all of our property, and we finally got some of that back, but not all of it, and then we sued for what they done to me, and the Judge said they had an insurance, and they didn't tell us that they had insurance, so the Judge said we was too late for any of the insurance, and then on December 9 of two thousand, I think it was nine, they informed us that we could tell our side of the story -- or we couldn't tell our side of the story, and we couldn't get nothing from it because it was too long.  It happened too long ago, and that came from our attorney.

(Tr. at 50).

Plaintiff began experiencing pain after this assault (Tr. at 42). The ALJ asked her why she waited six years to apply for disability (Tr. at 50). She said her right side continually got worse (Tr. at 50). The ALJ asked her when it got so bad that she couldn't work (Tr. at 50). She said,

> Well, whenever I had the motel is whenever I realized I was going down, and we had the -- it happened in 2003. In 2006, we just had to sell it because I couldn't deal with the motel anymore. I kept falling and stuff, and then whenever I came up here, I tried to get a job, and I was asked if I had any health problems, and I would write down that I would fall, and I was told that they wouldn't risk -- I was a high risk for their insurance. And some of them was just telling me that they didn't need me.

(Tr. at 51). Plaintiff worked up until the time that she sold the motel in 2006, and she believes her accountant recorded the earnings under her Social Security number as well as her husband's (Tr. at 51). She moved from South Dakota to Missouri in 2006 (Tr. at 56). Before that move, she and her husband spent part of the year in Missouri and part of the year in South Dakota: "[T]he business got bad, and so we would close it down in the winter time, and come up here and live by my mom and dad." (Tr. at 56).

Plaintiff was asked for the number one reason she can't work; she said, "My falling and my back" (Tr. at 58). The ALJ asked whether plaintiff has a handicap placard for her car (Tr. at 58).

A:  No, sir.

Q:  Why not?

A:  I thought you had to have disability before you got one of them, sir.

(Tr. at 58).

Plaintiff's worst pain is in her lower back, down the back of her leg and in her buttocks (Tr. at 42). Plaintiff's pain has gotten gradually worse, and she began using a cane a couple years ago (Tr. at 42). Dr. Scheutz told her she could use the cane -- he did not write up a prescription (Tr. at 42). Plaintiff told him she got a cane and he said to go ahead and use it (Tr. at 42-43). He said it may help her balance and that she would be able to catch herself better when she started to fall (Tr. at 43). It helps somewhat by taking the pressure off her leg and hip (Tr. at 43). Plaintiff falls an average of six times a week (Tr. at 46). She falls because her right side and her leg go numb and she loses control of everything (Tr. at 51-52).

Plaintiff's back pain is constant (Tr. at 43). Nothing makes it worse (Tr. at 43). She has spasms when she wakes up in the morning (Tr. at 43). Walking and sitting bother her -- for relief she tries to lie down and she takes Ibuprofen (Tr. at 43). Plaintiff is up and down "all the time" but when she is sitting she always has her legs elevated (Tr. at 44). Plaintiff spends about four hours a day with her legs elevated, and then she walks (Tr. at 44). She elevates both her legs, even though only her right leg hurts, because she sits in a recliner and cannot keep one leg up and one leg down (Tr. at 59).

Plaintiff's right shoulder was injured during the assault (Tr. at 44). It feels like there is something "in there that's tearing [the] whole inside out of [her] shoulder" (Tr. at 44). Sometimes plaintiff cannot lift her arm higher than her shoulder. The shoulder will lock up, her hand and arms lock up, and she cannot do anything with her arm for a few seconds to a few minutes (Tr. at 44-45). However, sometimes she can lift it all the way up without any pain (Tr. at 45). Plaintiff has no difficulty raising her arm in front of her,

but she has trouble raising it to her side (Tr. at 45). Her fingers will go numb (Tr. at 45).

Plaintiff suffers from uncontrolled diabetes which causes blurred vision, fatigue, and frequent urination (Tr. at 45). She goes to the restroom every 10 to 15 minutes[1] because her sugar is high (Tr. at 45). Just being stressed out causes her sugar to be high (Tr. at 45). It was 248 the morning of the hearing, but sometimes it can get as high as 309 (Tr. at 46).

Plaintiff goes to the grocery store once a week in Fairgrove and once a month in Marshville (Tr. at 47). Her husband also takes her out to eat when he is home to get her out of the house (Tr. at 47).

Plaintiff has no side effects from medication (Tr. at 47). She is afraid of pain medicine, so the only medication she takes is over-the-counter Aleve, Advil or Tylenol (Tr. at 55). She does take medication for diabetes, hypertension and high cholesterol (Tr. at 57, 58). When asked what she is doing to try to lose weight, plaintiff said she walks in her yard, and she uses a glider walking machine every day, four times a day for 15 minutes each time (Tr. at 57).

Plaintiff lives in a house with her husband (Tr. at 47). The house has two stories, and her bedroom is on the second floor (Tr. at 51). There are 12 steps to get from the first floor to the second (Tr. at 51). She is able to do things around the house like cook, clean, and other chores at her own "timing" (Tr. at 47). Whenever her body feels like doing something, she does it (Tr. at 47). Plaintiff's husband is an over-the-road truck

---

[1]I note that plaintiff's hearing took 57 minutes during which she did not use the restroom.

driver and is not always home (Tr. at 48).  She cooks for herself when he is gone and she does the dishes (Tr. at 48).  Plaintiff has a driver's license and has no difficulty driving (Tr. at 48).

Plaintiff is home by herself a lot (Tr. at 53).  She has a dog which is part Chihuahua (Tr. at 53).  Plaintiff did not want a Boxer or a Rottweiler or a Doberman because she did not want a big dog inside the house (Tr. at 53).  Plaintiff lives in the country on 4 1/2 acres (Tr. at 53-54).  Plaintiff's husband will be gone driving for six weeks at a time (Tr. at 54).  Her neighbor helps her cut part of the grass, but the rest of the acreage does not get tended (Tr. at 54).  Plaintiff has two horses that range on her property (Tr. at 54).  Her neighbors bring three 1,000-pound bales of hay at a time, and plaintiff is able to walk out and turn the water on to give them drinking water (Tr. at 54).

Plaintiff's typical day includes walking in her yard, walking in her house, and sitting in a chair (Tr. at 48).  She uses her cane all the time (Tr. at 48).  She reads and does word finders and only has difficulty with concentration when her pain is too bad (Tr. at 49).

Plaintiff does not have health insurance (Tr. at 55).  Plaintiff's husband is considered an owner/operator, but he drives another man's truck (Tr. at 55).

On a good day, plaintiff can walk five to eight minutes at a time (Tr. at 58).  She can stand, with a cane, for five to six minutes at a time (Tr. at 58).  She can sit for only five to six minutes at a time (Tr. at 59).  On a good day, plaintiff can lift a maximum of

three to four pounds (Tr. at 59).  She gets her groceries into the house by carrying a

little bit at a time[2] (Tr. at 59).

## 2.    Vocational expert testimony.

Vocational expert Cynthia Younger testified at the request of the Administrative

Law Judge. The first hypothetical involved a person limited to light work and who must

use a cane for ambulation.  The person must be afforded the option to sit and stand,

sitting up to 30 minutes and then standing up to 30 minutes, as needed. The person

could only occasionally climb ramps and stairs and could never climb ladders, ropes

and scaffolds.  The person could only occasionally reach overhead with the right

dominant extremity, must avoid concentrated exposure to vibration, and would be

limited to occupations which do not require exposure to dangerous machinery and

unprotected heights (Tr. at 60).  The vocational expert testified that such a person could

perform plaintiff's past position as a motel desk clerk (Tr. at 60).  According to the

Dictionary of Occupational Titles, a motel desk clerk does not have to climb, balance,

stoop, kneel, crouch or crawl.  Reaching and handling are occasional. Fingering is

frequent.  Feeling is not required. Tasting and smelling are not required. Talking and

hearing are frequent.  The noise intensity level is moderate (Tr. at 61).

In addition, such a person could work as an office helper, DOT 239.567-010, a

light unskilled job with approximately 2,500 in the State of Missouri and 60,000 in the

country (Tr. at 61).  The person could be a recreation aide, DOT 195.367-030, a light

---

[2]This would presumably, however, cause her to make more trips from her car to her
house and as a result walk for more than just a few minutes at a time.

unskilled job with 760 in the state of Missouri and 38,500 in the country (Tr. at 61). The person could work as a storage facility rental clerk, DOT 295.367-026, a light unskilled job with approximately 680 in Missouri and 32,000 in the country (Tr. at 61). If the person could only stand or walk for two hours per day and lift no more than ten pounds, the person could not work (Tr. at 62).

The next hypothetical incorporated the findings of Dr. Schuetz in his Medical Source Statement - Physical dated August 2, 2010 (found at pages 325-326) (Tr. at 61). Those limitations include the ability to lift no more than five pounds, stand or walk for 15 minutes at a time with a cane, stand and walk two hours total all day, sit for 30 minutes at a time, and sit for three hours total all day. The person could have no exposure to any environmental factors and would need to lie down or recline for 15 to 20 minutes five times during each work day. The vocational expert testified that because the sitting, standing and walking limitations total less than eight hours, such a person could not work (Tr. at 61). The ALJ asked the vocational expert to assume such a person could work an eight-hour day, but because of the other limitations such a person could not perform light work and some of the sedentary jobs would also be precluded (Tr. at 61-62).

**3.       Vocational expert interrogatories**.

At the conclusion of the administrative hearing, the ALJ ordered consultative exams. He then submitted written interrogatories to vocational expert Michael J. Wueman.

The first hypothetical involved a person who had the residual functional capacity to perform light work except he must avoid sitting continuously for more than one hour, walking continuously for more than one hour, or standing continuously for more than one hour. The person could sit for a total of eight hours per day, stand six hours per day, and walk for six hours per day. The person could frequently reach, handle, finger, feel, push and pull. He could only occasionally climb, balance, stoop, kneel, crouch and crawl. He could have occasional exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity, wetness, dust, fumes, pulmonary irritants, hot and cold temperature extremes and vibration. The person should not be exposed to more than loud noise (Tr. at 247). The vocational expert stated that such a person could be a motel owner, plaintiff's past relevant work. The person could also work as an arcade attendant, with 1,275 in Kansas and 130,500 in the nation. The person could work as a parking lot attendant with 250 in Kansas and 126,800 in the country (Tr. at 248).

**B.     *ADMINISTRATIVE REPORTS***

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1974 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1974 | $ 496.00 | 1993 | $ 0.00 |
| 1975 | 1,387.75 | 1994 | 0.00 |

| | | | |
|---|---|---|---|
| 1976 | 1,562.30 | 1995 | 2,729.70 |
| 1977 | 1,744.04 | 1996 | 8,416.86 |
| 1978 | 0.00 | 1997 | 6,245.36 |
| 1979 | 2,180.08 | 1998 | 2,297.93 |
| 1980 | 0.00 | 1999 | 2,594.80 |
| 1981 | 187.97 | 2000 | 3,035.00 |
| 1982 | 1,227.73 | 2001 | 2,615.14 |
| 1983 | 3,646.00 | 2002 | 3,961.03 |
| 1984 | 1,201.00 | 2003 | 1,514.90 |
| 1985 | 1,730.26 | 2004 | 379.18 |
| 1986 | 2,004.83 | 2005 | 0.00 |
| 1987 | 839.00 | 2006 | 0.00 |
| 1988 | 6,691.16 | 2007 | 0.00 |
| 1989 | 9,745.16 | 2008 | 0.00 |
| 1990 | 10,812.17 | 2009 | 0.00 |
| 1991 | 10,797.19 | 2010 | 0.00 |
| 1992 | 3,582.97 | 2011 | 0.00 |

(Tr. at 146).

**Police Report**

At the request of the ALJ, plaintiff submitted a police report from the 2003 incident which actually occurred in Missouri (Tr. at 149-156). The report shows that the incident occurred in a residence/home (Tr. at 149). Plaintiff reported that a seven-diamond gold engagement ring worth $2,000, jewelry (not described) worth $250, a pair of Black Hills gold leafed earrings worth $100, a Black Hills gold necklace worth $150, prescription narcotic medicine, 2 keys to a shed behind the residence, and white pearl earrings worth $65 were stolen during the incident. Oddly, plaintiff was listed as

"offender #1" and Sue Lafferty Blum was listed as "offender #2".

The narrative of the report states that on December 29, 2003, Officer Paul Satterfield was dispatched to a residence at 1216 Ransom Road. He met plaintiff in the driveway and she said she had been thrown out of her house, her animals had been abused, and she had been physically abused. She stated that her sister-in-law had come into her house and that when plaintiff tried to go into the house she had been pushed and shoved.

Plaintiff's sister-in-law told police that the house belonged to her. She said she had let her brother (plaintiff's husband) and plaintiff stay at the residence after her parents died. She showed the officer a copy of a beneficiary deed with her name on it. She stated that plaintiff and her husband were supposed to be paying the utilities at the residence but had not been. The arrangement had been that the utilities would be paid by plaintiff and her husband, and that they would leave the residence when the sister-in-law came to the residence. She told the officer that she had already talked to an attorney and that eviction papers were in the mail.

The sister-in-law told police that she had gone into the residence to check on her property, and plaintiff came into the residence very upset. She said plaintiff had assaulted her and her son, and the son lifted his shirt for the officer to show him a red mark. The officer was unable to see a red mark. The sister-in-law indicated she wanted to file charges against plaintiff for assault.

Plaintiff stated that her sister-in-law had also assaulted her and abused her animals while at the residence. The officer observed that the animals appeared to be in

14

good condition.

The officer informed both women that who had what right to the residence was a civil matter to be handled in civil court. He invoked "the 12 hour rule" and asked plaintiff to leave the area for 12 hours.

Plaintiff completed a Voluntary Statement that was undated. Plaintiff reported that she had gotten home from work at 1:30 and found that the locks had been changed. She rang the doorbell and Person A[3] answered the door and refused to allow plaintiff to enter. Plaintiff indicated that it was her house, and she pushed her way in but was tripped by Person A. She hit her back on an end table. Person B yelled, "Throw her out the door!" She got up and felt pain in her back, and she had no feeling in her right leg. Despite that, she moved to the middle of the room and asked for a phone so she could call 911. She asked to see her pets and was told, "No". Plaintiff pushed Person A who fell into Person B. Person B hit plaintiff in the face but plaintiff does not think Person B meant to do that. Another person arrived and they began calling plaintiff a fat worm. She yelled at them to stop saying this. Plaintiff got up and headed for the door. Person B said, "I could hurt you bad." Person A indicated that Person B could kill plaintiff if she wanted. Plaintiff was by the door and screamed. Two of the individuals in the house pushed plaintiff out the door and shut the door on her foot. She was outside when the officer arrived. After the officer had been inside 15 to 20 minutes, he came outside and told plaintiff she had to leave for 12 hours to cool off. Plaintiff indicated at the end of this statement that Person A "was the one doing the most harm to me. He

_____

[3]All but the person's initials have been redacted.

would hit me with his chest and arms. He would grab me and swing me around hurting me."

**Letter from Prosecuting Attorney**

On April 3, 2004, Sidney Pearson, Prosecutory Attorney for Crawford County, Missouri, wrote a letter to plaintiff stating in part as follows: "As you probably expected, given the content of the report, I still decline to file charges in this matter." (Tr. at 157).

**Function Report - Adult**

In a Function Report dated December 30, 2009, plaintiff described her day (Tr. at 174-181). She gets up at 7:30, gets dressed, eats around 8:30, does light house work, watches television, then walks on her glider. She indicated she walks for either 30 or 20 minutes -- both numbers are written, and I cannot tell which was meant to replace the other. "I do this twice a day." She eats lunch and then watches television. She calls her mom, then gets up and does something around the house. She eats supper, feeds the dog, and does the dishes. She goes to bed at 8:00 p.m. and watches television. She cooks for her husband when he is home. Plaintiff has no problem dressing herself. She has no problem bathing herself unless her leg goes numb and then she falls. She prepares her own meals. She is able to clean and do laundry. She does these things once a week for about four hours. She cannot do yard work due to falling. She goes outside twice a day. She is able to walk or drive a car when she goes out, and she can go out alone. She shops in stores for food and clothing once a week for about three hours. Plaintiff lies in bed and watches television for about 12 hours or more per day. "I watch a lot of TV due to can't sleep due to pain and afraid of the people that cause my

injuries."  Plaintiff has trouble trusting people.

Plaintiff's impairments affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs.  She can pay attention "for as long as it take[s]".  She follows instructions very well.  Changes in routine do not bother her, but she does not handle stress well.  She has a fear of people, a fear of falling, a fear of being touched, a fear of being confined, and "fear for my life".  She uses a cane and indicated that it was prescribed by a doctor in 2006 (Tr. at 180).

Plaintiff ended her Function Report with the following narrative:  "I was injured on Dec. 29, 2003 - I was assulted [sic] by 3 people - The one was a black belt who triped [sic] and jump on my back pulling my arms & shoulders back of me and pulling them up with his nee [sic] in my lower back then when I got up he body slammed me over and over. Then the other 2 got involed [sic]." (Tr. at 181).

**Report of Contact**

In a Report of Contact dated March 10, 2010, the following was noted:

3/2 Call made to Clt regarding treatment - never had the LE [left extremity] arterial Doppler done due to a lack of insurance and no facility near her that could do the test without insurance. Clt also noted her doctor recommended she use a glider to increase circulation in her leg and cut down the risk of falling.  He told her not to exceed 45 minutes a day and not to exceed 15 to 20 minutes on the glider at a time. She tries to do 15 minutes at a time, three times a day.  Dr. Schuetz informed her the mass in her right hip is making the leg go numb and causing her to fall. Clt [said she] has seen Dr. Schuetz since MER [medical record] of 8/09, sent for an update and requested a statement on limitations caused by her leg/back and obesity.

3/9  Rcvd call from Dr. Schuetz office that they have not seen Clt since 8/21/09.  Called the doctor's nurse and lft msg requesting specific information.  The front desk commented Clt had just cancelled her apt for today.

(Tr. at 193).

That same day, plaintiff's application for disability benefits was denied.

## C.    SUMMARY OF MEDICAL RECORDS

December 23, 2003, is plaintiff's alleged onset of disability.

On December 30, 2003, plaintiff saw a treatment provider at Forest City Family Practice -- Dr. Schuetz's office -- reporting that she had been assaulted the day before by three individuals and had hit her back on the end of a table (Tr. at 334). X-rays of her chest and right ribs were unremarkable (Tr. at 340).

On January 2, 2004, plaintiff was seen at Forest City Family Practice complaining of low back pain (Tr. at 328). She reported rib pain and pain with breathing, and she said her stomach burned when eating and her leg shook in the mornings. Straight leg raising was negative. She was prescribed Vicodin (narcotic pain reliever).

More than two years later, on April 10, 2006, plaintiff was seen at Forest City Family Practice complaining a sore throat and chest pain (Tr. at 276-277). She reported pain with swallowing. Plaintiff's muscle strength and gait/station were normal. She received a prescription for antibiotics.

Eight months later, on December 15, 2006, plaintiff was seen at Forest City Family Practice complaining of fatigue and dizziness (Tr. at 275). Plaintiff's blood sugar was 314 and her blood pressure was high.[4] The treatment provider assessed diabetes mellitus type II, new onset, and uncontrolled hypertension.

───────────────

[4]Her systolic blood pressure was 178. Her diastolic blood pressure was at least 100; however, the exhibit stamp covers the rest of the number and it therefore cannot be read.

March 31, 2007, is plaintiff's last insured date.

Five months later, on May 23, 2007, plaintiff was seen at Forest City Family Practice with complaints of right shoulder pain (Tr. at 272-273). Her pain was described as a burning pain from shoulder to the lumbar area, daily, worse at bedtime. She said her pain was related to an injury from 2004. She had stopped taking her medication due to heaviness in her chest. She was taking only Tylenol PM. Plaintiff weighed 258 pounds. Her blood pressure was 136/84. The treatment provider assessed uncontrolled non-insulin-dependent diabetes mellitus type 2, hypertension controlled, high cholesterol, and chronic back pain, and recommended that plaintiff lose weight and increase her activity. She was given prescriptions for hypertension, diabetes, and high cholesterol.

Seven months later, on July 2, 2007, plaintiff was seen at Forest City Family Practice for a medication review and a sore throat for the past four days (Tr. at 270-271). She weighed 244 pounds. "Pt states she is a lot more active now! (has horses)" Her blood pressure was 140/96, gait and station were normal.

Seven months later, on January 29, 2008, plaintiff was seen at Forest City Family Practice complaining of right leg and back pain (Tr. at 268-269). Plaintiff weighed 238 pounds. Her blood pressure was 144/100. Muscle strength, gait and station were all normal. She was assessed with sciatica[5] and was given "no treatment."

---

[5]"Sciatica refers to pain that radiates along the path of the sciatic nerve -- which branches from your lower back through your hips and buttocks and down each leg. Typically, sciatica affects only one side of your body. Sciatica most commonly occurs when a herniated disk or a bone spur on the spine compresses part of the nerve. This causes inflammation, pain and often some numbness in the affected leg. Although the

Thirteen months later, on March 5, 2009, plaintiff had an MRI of her lumbar spine which was unremarkable (Tr. at 260-261, 316-317).

Six months later, on August 21, 2009, plaintiff was seen at Forest City Family Practice complaining of high blood pressure but without headaches (Tr. at 264-265). She weighed 253 pounds. She had been on vacation recently. Plaintiff denied chest pain, shortness of breath, dizziness and fainting. Gait and station were normal. Plaintiff was assessed with uncontrolled non-insulin-dependent diabetes with weight gain, high cholesterol, and uncontrolled hypertension. Plaintiff was told to lose weight. She said she was considering trying Nutrisystem and the doctor said that was a "good idea." Plaintiff was counseled on diabetes and agreed to lose weight and increase her activity.

On December 4, 2009, plaintiff applied for disability benefits.

On February 5, 2010, plaintiff was seen by Thomas Corsolini, M.D., in connection with her application for disability benefits (Tr. at 296-298).

> She says she last worked 2003 as a nurses aide. She had done that for about 14 years. She had also helped run a motel with her husband.
>
> Primary complaints are pain in the back, from the neck to the right shoulder, in the lower back toward the right side into the buttock, sometimes down to the knee. She says it hurts to put much weight on the right leg and that it sometimes gives out. She attributes most of these problems to a domestic violence episode in which other family members and in-laws beat her up in 2003 in connection with a dispute regarding possession of her mother-in-law's home. She says she was twisted and her back was jumped on and she was thrown to the ground where she struck a concrete statue on her back.
>
> . . . Records including an MRI report of the lumbar spine 3/5/09. No fracture or disc herniations are seen. Hemangioma [a benign tumor of blood vessels] is

---

pain associated with sciatica can be severe, most cases resolve with just conservative treatments in a few weeks." http://www.mayoclinic.com/health/sciatica/DS00516

described in the L5 vertebra, and mild degenerative changes are seen at the L4-5 level.

* * * * *

Ms. Lafferty is pleasant in all respects, 64 inches tall without shoes, 250 pounds. She tends to keep weight off the right leg when standing, and walks with a mild limp favoring the right leg. Head and neck posture normal with normal cervical spine range of motion in all directions. Upper extremity range of motion normal all joints bilaterally with some indication of discomfort and hesitation at the limits of right shoulder range of motion. She has a general shakiness in the right arm to resistance, but strength is in the normal range. Specific resistance at the right rotator cuff group does not seem to be painful and there is no unusual weakness. . . .

She is able to squat independently. . . . Balance remains good throughout the examination.

Plaintiff's range of motion was normal, reflexes were normal, heel/toe walk was normal, Romberg test was normal, overall gait pattern was smooth and with good balance. Shoulder, elbow and wrist range of motion was completely normal in both arms. Grip strength and upper extremity strength were normal in both arms.

Impression is a collection of lingering musculoskeletal complaints, combined with a relatively low level of fitness and obese conditions. . . . I think that Ms. Lafferty is not capable of lifting or carrying 20 pounds on an occasional basis, but could probably tolerate standing and/or walking up to two hours in a normal working shift.

On February 19, 2010, Kenneth Bowles, Ph.D., completed a Psychiatric Review Technique finding no medically determinable impairment (Tr. at 299-308). In support of his finding, Dr. Bowles wrote:

51 yr old female alleges only physical impairments; however, on her 3373 she reports multiple fears.

On clt's 3373/ADL [activities of daily living] 20a abilities checklist she indicated her conditions affected most of the listed physical abilities. She did not indicate

having any mental limitations in functioning, but did indicate that cannot handle stress . . .[6], and that she has fear of people, being touched, being confined, and for her life, and that she no longer enjoys social functions due to not being able to trust people. She implies that this is due to her fear of walking without falling, and a violent assault on her that took place against her in 12/93.

There was no indication of mental c/o [complaints], Sx [symptoms], or Dx [diagnoses] in MER [medical records].

No mental MDI [medically determinable impairment].

On March 2, 2010, Pam Chandler of Disability Determinations called plaintiff regarding her treatment (Tr. at 193). Plaintiff said she had not had the left leg arterial Doppler done due to a lack of insurance and there was no facility near her that could do the test without insurance. She indicated that she had seen Dr. Schuetz at the Forest City Family Practice after August 2009, which was the last record received by Disability Determinations. Ms. Chandler called Dr. Schuetz's office on March 9, 2009, and was told that Dr. Schuetz in fact had not seen plaintiff since August 21, 2009, and that plaintiff had just called to cancel her appointment for that day. The following day, plaintiff's application for disability benefits was denied.

On April 5, 2010, plaintiff was seen at Forest City Family Practice with complaints of back pain and right leg pain, increased blood pressure, and increased blood sugars which had been running in the 200s (Tr. at 321-322). On exam, muscle strength was normal, gait and station were normal, mood was normal, eye contact was normal. Plaintiff weighed 254 pounds. Her blood pressure was 146/100. Plaintiff was assessed

---

[6]Dr. Bowles noted that plaintiff reported she could not handle stress or change. However, she actually reported that she could not handle stress but changes in routine do not bother her.

with diabetes, hypertension, and another illegible "syndrome" (Tr. at 322). Her treatment consisted of being told to take Calcium and Lantus, which is insulin.

Five months later, on September 2, 2010, plaintiff was seen at Forest City Family Practice to discuss insulin (Tr. at 319-320). She reported "[p]ain to back and all the way down body." Plaintiff weighed 250 pounds. Her blood pressure was 130/90. Her muscle strength was normal, gait and station were normal, mood was normal, eye contact was normal, thought and perceptions were normal. She was assessed with diabetes, hypertension and high cholesterol and medications for those conditions were prescribed.

That same day, Dr. Schuetz -- plaintiff's doctor at Forest City Family Practice -- completed a Medical Source Statement - Physical (Tr. at 325-326). He found that plaintiff could lift a maximum of five pounds at a time, she could stand or walk continuously with a cane for only 15 minutes, she could stand or walk for a total of 2 hours each workday, she could sit continuously for 30 minutes, she could sit for a total of 3 hours per workday, and she was limited in her ability to push or pull with her hands and feet due to pain. He found that she can never climb, stoop, kneel, crouch, crawl, or be exposed to extreme cold, extreme heat, weather, wetness, humidity, dust, fumes, vibration, hazards and heights. He found that she could occasionally balance, reach, handle, and finger. He noted that plaintiff would have to lie down or recline to alleviate symptoms 5 times in an 8-hour period for 15 to 20 minutes at a time. On September 7, 2010, he responded to an interrogatory, stating that plaintiff's limitations pre-existed his first visit with her (Tr. at 324).

Five months later, on February 17, 2011, plaintiff was seen at Forest City Family Practice reporting that her right side had gone numb and given out and she fell three days earlier (Tr. at 337-338). Her gait was unsteady. She said she was too sore for any manipulation. Plaintiff stated that it was a long drive to this doctor's office and that she would be having her disability hearing soon. No treatment was listed.

Plaintiff's disability hearing was held on May 2, 2011.

On May 31, 2011, plaintiff saw David Lutz, Ph.D., at the request of the ALJ (Tr. at 345-353). Dr. Lutz found that plaintiff had no limitation in her ability to understand and remember simple instructions, carry out simple instructions, make judgments on simple work-related instructions, interact appropriately with supervisors, interact appropriately with co-workers, and respond appropriately to usual work situations and to changes in a routine work setting. He found that plaintiff had mild limitation in the ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, and interact with the public.

During her appointment with Dr. Lutz, plaintiff said that her doctor wanted to prescribe pain medication but she refused because she does not like pills. There is no reference in any of her medical records corroborating this. She told Dr. Lutz that she ran a motel until her injury; however, she actually worked there for three years after the incident.

Plaintiff's validity scales on the MMPI-2-RF suggested a consistent but overstated profile. "Such persons often report symptoms that may be out of proportion with their actual difficulties. . . . Surprisingly, there was almost a denial of family

difficulties, and instead more of a general desire to avoid close relationships and a general suspicion of others."

Dr. Lutz assessed anxiety and mood disorder due to general medical condition. He assessed a GAF of 60, which is mild to moderate symptoms.

That same day, plaintiff had an x-ray of her right shoulder (Tr. at 359). The results were normal.

On June 20, 2011, plaintiff saw Charles Ash, M.D., for a consultative exam (Tr. at 369-370). Plaintiff weighed 246 pounds. Her blood pressure was 213/123. Plaintiff was described as obese, she was observed to stand erect and move about satisfactorily without limp or list. She walked on toes and heels satisfactorily. She had moderate difficulty arising from the exam table but no difficulty arising from the chair, dressing or undressing. She had tenderness in her cervical spine but normal motion, no muscle spasm and no deformity. Her thoracic and lumbar spine had tenderness throughout. She had limited flexion but normal lateral bending, normal rotation and normal extension. She had normal range of motion in her arms with no weakness or atrophy. Grip strength was strong in both hands. Range of motion in both legs was normal. Straight leg raising was positive at 70 degrees on the right and 90 degrees on the left. Dr. Ash assessed degenerative arthritis of the lumbar and cervical spine.

Dr. Ash[7] completed a Medical Source Statement that same day (Tr. at 362). He found that plaintiff could lift 10 pounds frequently and 20 pounds occasionally. She

_____

[7]Plaintiff stated that Dr. Ash signed his report "Ash Ortho". He actually signed it C. J. Ash, which is the same way he signed his medical report. He wrote "Ash Ortho" on the line which asks for a printed name and specialty (Tr. at 362).

could sit, stand and walk for one hour each at a time. She could sit for a total of 8 hours, stand for a total of 6 hours and walk for a total of 6 hours in a workday without the use of a cane for ambulation. She could perform frequent reaching, fingering and feeling with both hands and frequent pushing and pulling with hands or feet. She could perform occasional climbing, balancing, stooping, kneeling, crouching or crawling and could tolerate occasional exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, pulmonary irritants, temperature extremes or vibration.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge James Harty entered his opinion on December 6, 2011 (Tr. at 11-23). Plaintiff's last insured date was March 31, 2007 (Tr. at 11, 13). Therefore, plaintiff must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits (Tr. at 11).

Step one. Plaintiff has not engaged in substantial gainful activity since December 29, 2003, her alleged onset date (Tr. at 13).

Step two. Plaintiff suffers from the following severe impairments: Type II diabetes mellitus, obesity, and mild degenerative disc disease of the lumbar spine (Tr. at 13). Plaintiff's hypertension is controlled adequately with medication, it causes no significant functional limitations, and it is therefore nonsevere (Tr. at 14). Plaintiff reported a shoulder impairment; however, there is no documented treatment or diagnosis of a shoulder impairment, an x-ray of the right shoulder was normal, and therefore plaintiff's shoulder impairment is not medically determined (Tr. at 14).

At the time plaintiff filed her application for disability benefits, she did not allege a mental impairment (Tr. at 14). She did, however, indicate that she could not handle stress, that she has a fear of people, that she fears being touched, that she fears being confined and that she fears for her life (Tr. at 14). Treatment records fail to reveal any reported psychological symptoms or limitations (Tr. at 14). Plaintiff underwent a psychological evaluation on May 31, 2011, after which she was diagnosed with anxiety, mood disorder, and post traumatic stress disorder (Tr. at 14). Although these are medically-determinable impairments, they do not cause more than minimal limitation in her ability to perform basic mental work activities and are therefore nonsevere (Tr. at 15).

Step three. Plaintiff does not have an impairment or combination of impairments which meets or equals a listed impairment (Tr. at 16).

Step four. Plaintiff retains the residual functional capacity to perform the full range of light work in that she can lift and carry 20 pounds occasionally and 10 pounds frequently (Tr. at 16). She can sit continuously for up to an hour, walk continuously for more than one hour, stand continuously for more than one hour, and is limited to no more than a combination of eight hours of sitting, six hours of standing and six hours of walking during any eight-hour period. She can frequently reach, handle, finger, feel and push/pull with her upper extremities. She can occasionally climb, balance, stoop, kneel, crouch and crawl. She can tolerate occasional exposure to unprotected heights, moving mechanical parts, operation of a motor vehicle, humidity, wetness, dust, fumes, pulmonary irritants, hot and cold temperature extremes, and vibration. She should not

be exposed to more than loud noise (Tr. at 16).

With this residual functional capacity, plaintiff can return to her past relevant work as a small business owner - motel (Tr. at 21).

Step five.  Alternatively, plaintiff is capable of performing other jobs available in significant numbers in the economy (Tr. at 22).  Plaintiff can work as an arcade attendant, DOT 342.667-014, which is light unskilled, and there are approximately 1,275 jobs in Kansas and 130,500 jobs in the country (Tr. at 22).  Plaintiff can work as a parking lot attendant, DOT 915.473-010, a light unskilled position with 250 jobs in Kansas and 126,800 jobs in the country (Tr. at 22-23).

Therefore, plaintiff was found not disabled at both steps four and five of the sequential analysis.

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d

220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms. On her Function Report - Adult form, she indicated that she was: (1) independent with personal care; (2) prepares meals; (3) does laundry; (4) does dishes; (5) shops for groceries and clothing; and, (4) cares for a small animal.  These described daily activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

The evidence shows that the claimant has not received the type of medical treatment one would expect for a totally disabled individual, as she has not had physical therapy, epidural injections, chiropractic therapy []or made use of a TENS unit. Further, the claimant testified that she takes over the counter medication for pain. This is not medication designed for the relief of severe pain. This is not to say the claimant is pain free. However, evidence falls short of establishing the presence of pain that is so severe it is disabling. The undersigned is aware that the claimant is without medical insurance and the lack of treatment may be due to the inability to afford such treatment.

The claimant testified that she could walk five to six minutes, sometimes walk for eight minutes, stand with a cane for five to six minutes, sit for five to six minutes and lift three to four pounds.  The claimant testified that on an average day, she spends four hours reclined and typically falls six times in a week. The undersigned finds that this is inconsistent with the claimant's testimony that she walks in her yard daily and uses a glider to exercise for 15 minutes four times per day.  As to the claimant's testimony of the frequency of falls, the undersigned notes that these complaints are absent from the records or the records do not reflect the same degree of severity or frequency. The undersigned finds that the evidence does not support a conclusion that the claimant's impairments compel her to recline for four hours a day and is in direct conflict with her physician's advice to increase activity.

(Tr. at 20).

## 1. PRIOR WORK RECORD

Plaintiff testified that she sold her motel in 2006 because she kept falling.

However, plaintiff never complained of falling to any doctor in any medical record until

February 17, 2011, when she reported that she had fallen three days earlier, or on

February 14, 2011.  She later testified that several years before the motel was closed,

"business got bad" and she would close the motel in the winter.  It seems more likely that plaintiff and her husband sold the motel in 2006 because "business was bad" and not because of her falling since her medical records do not reflect a fall until five years after the motel was sold.

Plaintiff claimed that she was unable to keep working in her motel in part because of a fear of her husband's family due to the assault in 2003.  However, this is not plausible since the motel was located in South Dakota, and plaintiff's in-laws lived in Missouri, and when plaintiff sold her motel she left South Dakota and moved to Missouri.

## 2.    DAILY ACTIVITIES

Plaintiff testified that she worked up until the time the motel was sold in 2006 and part of her duties included cleaning the rooms by herself.  This is inconsistent with an alleged onset of disability in 2003.

Plaintiff lives in a two-story house and has to traverse 12 stairs in order to get to the second floor where her bedroom is located.  She testified that her husband is on the road up to six weeks at a time; therefore, the risk of her falling in the house while she is alone appears to be much less than she has tried to imply.

Plaintiff is able to clean, cook, and do other chores.  She has no difficulty driving despite an alleged shoulder impairment and problems sitting for more than a few minutes at a time.

Plaintiff reported no problem dressing herself or bathing herself with respect to her alleged shoulder impairment.

Plaintiff reported that she shops in stores for food and clothing once a week for about three hours. This is entirely inconsistent with her allegation that on a good day she can walk for five to eight minutes at a time, and that she can stand with a cane for five to six minutes at a time.

### 3.    DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff testified that she falls an average of six times a week.  However, the only fall she ever reported in any medical record occurred on February 14, 2011 -- just before her administrative hearing (and in fact she mentioned during that appointment that her disability hearing was coming up).  During that doctor appointment, her treating physician did not note any abnormalities in his physical exam, did not assess anything that would be related to plaintiff falling, and provided no treatment.

### 4.    DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

Plaintiff testified that she is afraid of pain medication and that is why she only takes over-the-counter pain medicine.  This is inconsistent with the record. First, plaintiff reported her narcotic pain medicine as having been stolen during the incident in 2003 (which means she had to have been taking narcotic pain medicine before the alleged assault) .  Second, there is no medical record that shows a doctor recommending pain medicine and plaintiff refusing it.

Plaintiff told Dr. Lutz, a psychologist who examined her at the request of the ALJ after the administrative hearing, that her doctor had wanted to prescribe pain medication but she refused "because she does not like pills."  Not only is there no such reference in

any medical record, I note that plaintiff has never reported a difficulty taking pills for hypertension, diabetes, and high cholesterol.

## 5.    FUNCTIONAL RESTRICTIONS

In her Function Report plaintiff stated that her cane had been prescribed by a doctor. During her testimony she admitted that no doctor had prescribed a cane and that no doctor had even suggested she try a cane until after she bought one.  When she saw Dr. Corsolini in February 2010 -- more than six years after her alleged onset date -- the doctor observed that plaintiff's balance "remain[ed] good throughout the examination."

Dr. Ash noted on June 20, 2011 -- seven and a half years after plaintiff's alleged onset date -- that plaintiff stood erect and moved about satisfactorily without limp or list. She walked on toes and heels satisfactorily.

The record consistently shows recommendations by plaintiff's treating doctor to lose weight and get more active.  These records are inconsistent with plaintiff's allegations that her doctor recommended that she limit the amount of time she spends on her glider and that she limit her lifting and other activities.

## B.    CREDIBILITY CONCLUSION

In addition to the above Polaski factors, I note the following with regard to plaintiff's credibility.

In her Function Report plaintiff said someone with a "black belt" had tripped her, jumped on her back, pulled her arms and shoulders back and pulled them while putting his knee in her back, and that she was body slammed over and over.  Plaintiff testified

that during the incident with her in-laws she was put in a "crucifix" hold; however, all of that differs significantly from what she told the officer on the scene and what she told Dr. Schuetz when she went to his office the day after the incident. In both of those records, plaintiff said she was tripped as she tried to enter the house against the will of the occupants, and she fell and hit her back on an end table.

Plaintiff also testified that she did not know why the prosecutor did not file charges; however, the letter from the prosecutor refers to the police report as his reason for not filing charges, and that police report lists plaintiff as Offender #1.

Plaintiff testified that all of her property was stolen during the incident; however, the police report shows that she reported nothing more than jewelry and narcotic pain medicine as having been stolen.

In her undated "Voluntary Statement" plaintiff described having been grabbed, swung around, and hit with someone's chest and arms. She did not report this to the responding officer or to her treating doctor the next day. Instead, she told them both that she was tripped and she fell, hitting her back on an end table, and she told the officer that someone had hit her in the face but she believed it had been unintentional.

When plaintiff was contacted by Disability Determinations on March 2, 2010, she lied and said that she had seen Dr. Schuetz since August 2009. Dr. Schuetz's office confirmed that in fact plaintiff had not been to that office in the past almost five months, since August 2009.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective allegations of disabling symptoms are not credible.

## VII. OPINIONS OF DR. SCHUETZ AND DR. CORSOLINI

Plaintiff argues that the ALJ erred in discounting the opinions of Dr. Schuetz in his Medical Source Statement and of Dr. Corsolini when he found that, despite all of the normal medical results during his exam, plaintiff was "not capable of lifting or carrying 20 pounds on an occasional basis, but could probably tolerate standing and/or walking up to two hours in a normal working shift."

First, I note that plaintiff's attorney agreed during the administrative hearing that the only evidence up to that point of any orthopedic abnormality was "subjective, but no[t] objective." (Tr. at 40). The evidence up to that point included all of the medical records of Dr. Schuetz and the record of Dr. Corsolini. The only physical examination that occurred after that hearing was the examination by Dr. Ash, the report plaintiff now claims the ALJ erred in relying upon.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).

The ALJ had this to say about Dr. Schuetz's Medical Source Statement:

The undersigned has considered, but is unable to give controlling weight to the opinion of the claimant's treating physician, Hugh A Schuetz, D.O., dated September 2, 2010 who indicated the claimant is unable to perform even sedentary work on a regular and continuing basis. The undersigned notes that Dr. Schuetz failed to reveal the impairments or type of significant clinical and laboratory abnormalities one would expect, given these limitations. Further, the encounter note, dated the same day as his report, shows an unremarkable musculoskeletal examination. For these reasons, the undersigned is able to accord Dr. Schuetz's opinion no more than little weight.

The record supports the ALJ's finding. Dr. Schuetz took x-rays of plaintiff's chest and right ribs the day after her alleged assault, and those x-rays were normal. A couple days later, straight leg raising was normal. Plaintiff went more than two years before she saw Dr. Schuetz again, even though this was after her alleged onset date. Plaintiff had long periods of time between each visit to Dr. Schuetz.

In December 2006, three years after her alleged onset date, plaintiff saw Dr. Schuetz and complained of symptoms of diabetes and was found to have newly-diagnosed diabetes mellitus. During that visit she did not complain of any problems falling; going numb; difficulty sitting, standing, walking, or lifting; or needing to lie down for most of the day.

Plaintiff's first complaint of shoulder pain occurred on May 23, 2007 -- three and a half years after her alleged onset date and after her last insured date. Plaintiff was not offered any pain medication by Dr. Schuetz. Instead, he recommended that she lose weight and increase her activity.

Plaintiff's visit on July 2, 2007, to Dr. Schuetz was for a sore throat. Despite allegedly having limited funds for medical treatment, plaintiff did not use the occasion of a sore throat to mention her disabling conditions. In fact plaintiff did not complain of any

pain on that visit and commented that she had been more active.

When plaintiff complained of back and leg pain in January 2008 (more than four years after her alleged onset date), Dr. Schuetz found that her muscle strength, gait and station were all normal. Though plaintiff argues an absence of a finding of musculoskeletal normality is no reason to make the assumption Dr. Schuetz believed plaintiff's musculoskeletal system was normal, he did not offer any treatment after he assessed sciatica. In fact, he specifically wrote, "no treatment". I think the ALJ can safely assume that even though Dr. Schuetz left the musculoskeletal boxes blank, he did not believe that plaintiff had a disabling musculoskeletal impairment based on his decision to offer "no treatment."

In August 2009 (almost six years after her alleged onset date), plaintiff went to see Dr. Schuetz complaining of high blood pressure. Again, despite having limited funds for medical care, she did not take this opportunity to mention her disabling impairments during this visit. Plaintiff's gait was normal, she was told to lose weight. Plaintiff agreed to increase her activity.

In April 2010 plaintiff complained to Dr. Schuetz of back and leg pain. Dr. Schuetz performed a physical exam and found that plaintiff's muscle strength was normal. Her gait and station were normal. Her mood was normal, eye contact was normal. The only treatment he recommended was calcium and insulin. He recommended no treatment for any physical or mental impairment.

On September 2, 2010 -- the same day plaintiff asked Dr. Schuetz to complete a Medical Source Statement for her disability case -- she complained of pain in her back

and "all the way down [her] body." On exam plaintiff's muscle strength was normal. Her gait and station were normal. Her mood and eye contact were normal. Her thought processes and perceptions were normal. Dr. Schuetz diagnosed nothing more than diabetes, hypertension, and high cholesterol. He recommended no orthopedic tests. He made no orthopedic assessment. He recommended no orthopedic treatment. Yet on that same day, he completed a Medical Source Statement finding that plaintiff could lift no more than five pounds, that she could only walk or stand with a cane and only for 15 minutes at a time, that she could only sit for 30 minutes at a time and for three hours total per day, that she was limited in her ability to push or pull with her hands or feet due to pain (yet he had not even recommended so much as over-the-counter pain medication) and that she would have to lie down or recline to alleviate symptoms five times per work-day for 15 to 20 minutes each time.

It was not until 5 1/2 months later that plaintiff complained for the first time of having fallen due to her right side having gone numb. She mentioned that her disability hearing was coming up. Despite Dr. Schuetz having found a half a year earlier that plaintiff was so incredibly limited and having been told by her on this day that her body was going numb and causing her to fall, he offered no treatment.

The attorney at plaintiff's hearing was correct -- this is nothing but subjective evidence. It is clear that Dr. Schuetz did not believe plaintiff is limited to the extent reflected in his Medical Source Statement. She never mentioned a need to lie down in any medical visit over an eight-year period. She never mentioned a difficulty sitting,

standing, or walking. He never found any abnormality in any physical exam, not even the day after she was physically assaulted.

Dr. Schuetz's checklist responses failed to reveal any of plaintiff's impairments or clinical or laboratory findings that one would expect given the significant limitations he noted. "The better explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3). The ALJ was entitled to discount Dr. Schuetz's opinion in the Medical Source Statement because it was inconsistent with his clinical treatment notes. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit the opinion of Dr. Schuetz in the Medical Source Statement.

Dr. Corsolini, who examined plaintiff in connection with her disability application, provided the opinion that, despite all of the normal medical findings during his exam, plaintiff was "not capable of lifting or carrying 20 pounds on an occasional basis, but could probably tolerate standing and/or walking up to two hours in a normal working shift." During that appointment, plaintiff told Dr. Corsolini that her right leg gives out. She said that family members and in-laws beat her up in 2003, and that she "was twisted and her back was jumped on and she was thrown to the ground where she struck a concrete statue on her back." This is clearly inconsistent with plaintiff's report of the incident both to the police on the day it occurred and to Dr. Schuetz the day after. Dr. Corsolini reviewed plaintiff's MRI and noted that the only abnormalities were mild

degenerative changes and a benign tumor of blood vessels. Despite plaintiff having normal gait during every doctor appointment in this record, she displayed a limp when she went to see Dr. Corsolini in connection with her application for disability benefits. Her physical exam was entirely normal with the exception of her complaints of tenderness and pain which are wholly subjective. She presented a "shakiness in the right arm" which was never noted by any other doctor. Dr. Corsolini's opinion that plaintiff could not lift 20 pounds and would be limited to standing or walking only two hours per day is based on nothing but plaintiff's own allegations, as his entire physical exam resulted in normal findings.

Subsequent to the exam with Dr. Corsolini, plaintiff underwent an x-ray of her shoulder and it was normal.

Dr. Corsolini is not a treating physician. However, a physician's opinion may be properly discounted when the conclusions are based on a claimant's subjective complaints, particularly when the claims are found to be not wholly credible. Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996). Such is the case here. The substantial evidence in the record as a whole supports the ALJ's decision to discredit the opinion of Dr. Corsolini with respect to plaintiff's physical limitations.

The findings of Dr. Ash are based on his own physical examination and not on plaintiff's subjective complaints. Therefore, the ALJ was justified in giving more weight to the opinion of Dr. Ash than the opinions of Drs. Schuetz and Corsolini.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 31, 2013